943 F.2d 180
 UNITED STATES of America, Plaintiff-Appellee,
v.
Andrew P. O'ROURKE, as County Executive of the County of
Westchester; Joseph Caverly, as Commissioner, Parks,
Recreation and Conservation of the County of Westchester;
and the County of Westchester, Defendants-Appellants,
New York State Environmental Facilities Corporation, Defendant.
 No. 925, Docket 90-6263.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 23, 1991.
Decided Aug. 21, 1991.
 
 Carol L. Van Scoyoc, Deputy Westchester County Atty., White Plains, N.Y. (Marilyn J. Slaatten, Westchester County Atty., of counsel), for defendants-appellants.
 Nancy G. Milburn, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y. and Richard M. Schwartz, Asst. U.S. Atty., S.D.N.Y., of counsel), for plaintiff-appellee.
 Before VAN GRAAFEILAND, MINER and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants Andrew P. O'Rourke, County Executive of the County of Westchester, Joseph Caverly, Commissioner, Parks, Recreation and Conservation of the County of Westchester, and the County of Westchester (the "County") appeal from an order of the United States District Court for the Southern District of New York, Constance Baker Motley, Judge, finding them in contempt of a consent decree and imposing, inter alia, a $1,000,000 fine. See United States v. O'Rourke, 740 F.Supp. 969 (S.D.N.Y.1990). The County had entered into the consent decree in February 1975 in order to settle a lawsuit in which the United States sought primarily to close a garbage dump that was polluting the Hudson River. This appeal turns upon a provision of the consent decree that requires the County "to devise long range plans for solid waste disposal for Westchester County." The district court determined that the County was thereby obligated to develop the capability to dispose of "all solid waste in the County including municipal, commercial, and construction and demolition waste," 740 F.Supp. at 982, and had failed to do so. See id.
 
 
 2
 We disagree with the district court's interpretation of the consent decree, and consequently reverse the judgment of contempt.
 
 Background
 
 3
 The instant contempt proceeding arises from an action that the United States commenced against the County and related defendants in May 1972, in the United States District Court for the Southern District of New York, pursuant to sections 10 and 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 403 and 407 (1988), and section 1 of the New York Harbor Act of 1888, 33 U.S.C. § 441 (1988). The complaint alleged that a garbage dump operated by the County at Croton Point was discharging a noxious liquid known as leachate into the Hudson River and surrounding tidal areas. The complaint primarily sought to enjoin this pollution, halt all garbage dumping at Croton Point as soon as practicable, and require the County to locate and utilize alternative, environmentally safe dump sites.
 
 
 4
 In response to a motion by the United States for a preliminary injunction, the district court entered an order in June 1972 (the "1972 Order") that required the County to take a number of remedial actions with respect to Croton Point, including: covering areas of the dump with soil, compacting waste in shallow layers, barring or specially treating certain industrial wastes, removing wastes from the tidal streams and marsh, and constructing a protective berm and fencing. The 1972 Order also mandated that the County submit a report of its progress each month until the remedial measures were complete. Of greatest relevance to this appeal, the court further:
 
 
 5
 ORDERED that the County shall prior to July 1, 1972 retain, and continue to use reputable consultants acceptable to the United States to examine and report on (1) the location and feasibility of alternate and/or interim sites for garbage disposal, (2) the economic markets for recycled material available to handle recyclable resources collected by the communities of Westchester and (3) evaluate commercial offers for recycling made to the County; and all existing pertinent reports, studies, memoranda, tests and supporting material shall be delivered to the United States prior to June 15, 1972....
 
 
 6
 Over the next two years, the County submitted monthly reports detailing its compliance with the 1972 Order. During this period, the County engaged the services of the New York State Environmental Facilities Corporation (the "EFC") and its consultant, Leonard S. Wegman Co., for the "formulation of a comprehensive County-wide solid waste management disposal plan for review and adoption by the County." Based upon these consultations, the County formulated a Plan for Solid Waste Management in Westchester County (the "1974 Plan") that was annexed to the County's twenty-fourth report to the district court in May 1974.
 
 
 7
 The 1974 Plan consisted of a broad outline of the County's waste management objectives and a rather general description of how they might be implemented. The plan contemplated the acquisition of landfill sites as alternatives to Croton Point, the acquisition and upgrade of incinerators belonging to Westchester municipalities, and the recycling of materials separated before collection and after incineration. The County Board of Legislators (the "Board") unanimously adopted the 1974 Plan on August 19, 1974.
 
 
 8
 On February 4, 1975, the district court approved a consent decree (the "Decree") that settled the pending litigation between the United States and the County. The Decree initially recites that "the County has diligently complied or is in the process of complying with" the 1972 Order, and detailed the County's efforts in this regard. Following brief paragraphs relating to the district court's jurisdiction and the persons bound by the Decree, paragraph III permanently enjoins the County from permitting the deposit of refuse from Croton Point into the Hudson River. The paragraph contains an exception for the discharge of leachate due to natural water movements, provided that the County meets specified conditions. These include operating the landfill in accordance with regulations of the New York State Department of Environmental Conservation; determining the landfill's grade, shape, and maximum elevation; covering, seeding, and capping the areas that reach maximum elevation; studying the prospect of restoring damaged marshes; and fulfilling a series of monitoring and reporting duties. Paragraph IV provides that expansion of the Croton Point landfill will be subject to state and federal approval of plans to eliminate or collect and treat any discharge of leachate.
 
 
 9
 The present controversy focuses on paragraph V, which provides:
 
 
 10
 The County is permanently enjoined and required to continue to completion the consultation agreement now being performed by the Environmental Facilities Corporation with respect to recycling of solid wastes and resource recovery, and, on the basis of this study by the Environmental Facilities Corporation and any other pertinent and available studies and in consultation with DEC, to devise long range plans for solid waste disposal for Westchester County, which plans shall include resource recovery, if economically feasible.
 
 
 11
 (Emphasis added.)
 
 
 12
 The final three paragraphs of the Decree provide that (1) the United States is entitled to inspect the Croton Point landfill to ensure compliance with the Decree; (2) the Decree supersedes all prior court orders in the litigation; and (3) the court retains jurisdiction over the litigation.
 
 
 13
 In December 1978, then-County Executive Alfred DelBello recommended to the Board the construction within the County of a mass-burning incineration resource recovery facility at Charles Point, in Peekskill, New York. As the district court found, "[t]o obtain the necessary financing for the Facility, the County needed to obtain commitments from municipalities that a guaranteed quantity of refuse would be delivered to the Facility." 740 F.Supp. at 976. To this end, the County negotiated intermunicipal agreements ("IMAs") with thirty-five Westchester municipalities. Under the IMAs, the municipalities committed to deliver specified minimum tonnages of solid waste for the Charles Point facility, and to pay a "tipping fee" for each ton delivered. The County in turn agreed to accept and dispose of all solid waste collected by each participating municipality up to a maximum of 110 percent of its committed tonnage. In the aggregate, the thirty-five municipalities committed 419,000 tons of refuse per year to Charles Point, leaving the County potentially responsible for disposing of approximately 460,000 tons per year.
 
 
 14
 The County determined that it would need a facility with a capacity of 550,000 tons per year to fulfill its obligations under the IMAs. The district court found that the County also approached the private carters operating in Westchester in an effort to negotiate agreements that would commit additional tonnages to Charles Point. 740 F.Supp. at 976. It is undisputed, however, that during the planning stage, the private carters declined to participate.
 
 
 15
 In June 1981, the County, acting through the Westchester County Industrial Development Agency, contracted with Wheelabrator Frye, Inc. for the construction and operation of the Charles Point facility. Charles Point began accepting solid waste in October 1984. In 1986, state and federal environmental permits allowed an increase in disposal at Charles Point from 550,000 to 670,000 tons of solid waste per year, which represents 80 percent of the facility's potential capacity. When the Croton Point landfill closed in 1986, Charles Point became the County's sole means for solid waste disposal.
 
 
 16
 Meanwhile, in June 1985 the United States had begun an investigation regarding the County's compliance with the Decree. In August 1987, the United States moved to hold the County in contempt of the Decree, alleging that the County: (1) allowed the discharge of leachate from Croton Point into the Hudson River and surrounding marshes; and (2) "fail[ed] to develop a comprehensive long range plan for disposition of all solid waste generated within the County." Several months later, the parties settled with respect to the former ground.
 
 
 17
 On April 28, 1989, the district court heard oral argument on the remaining ground for the contempt motion. The County contended that it had satisfied the Decree by devising plans for the disposal of all garbage in the county, but had no power to require potential municipal and private participants to commit to the Charles Point facility, and in any event had not violated any clear and unambiguous provision of the Decree.
 
 
 18
 On June 14, 1990 (as amended July 10, 1990), the district court issued findings of fact and conclusions of law holding the County in contempt of paragraph V of the Decree. The court framed the dispositive issue as follows:
 
 
 19
 The language of the Consent Decree in Paragraph V is clear on its face as to the County's responsibility to devise and implement long range plans. The court has been required to ascertain the intent of the parties on the issue of whether the long range plans were to encompass all solid waste, including municipal, commercial (private) and construction and demolition (public and private).
 
 
 20
 740 F.Supp. at 982. In this regard, the court concluded: "The record discloses that the parties intended that the County be responsible for the disposal of all solid waste in the County including municipal, commercial, and construction and demolition waste." Id.
 
 
 21
 The court relied primarily upon four items in the record that purportedly evidenced the County's assumption of the stated responsibility. First, in a letter to the district court dated May 26, 1972, County Attorney John J.S. Mead stated:
 
 
 22
 The County's position is that we admittedly have a problem, and one to which we have been seeking a three-fold program: first, to provide for an end of all disposal at Croton Point as quickly as possible; second, to install recreational facilities on the resulting fill; thirdly, to provide a substitute method for the eventual disposition of the county's solid waste, now 2,500 tons a day.
 
 
 23
 740 F.Supp. at 973 (emphasis added by district court). Reasoning that "[t]he 2500 ton per day figure included municipal, commercial and construction and demolition waste," id., the district court considered the letter a representation "that the County had assumed full responsibility for the disposition of all of the solid waste for Westchester County." Id. at 971.
 
 
 24
 Second, County Executive DelBello's letter dated May 7, 1974, transmitting the 1974 Plan to the Board, described the first "basic element" of the plan as follows:
 
 I. County Responsibility
 
 25
 The County of Westchester will assume the total responsibility for the disposal of the 900,000 tons per year of solid waste generated by the County's municipalities. The methods of disposal will be consistent with the highest environmental standards. The municipalities will continue to be responsible for the collection of the wastes within their borders, and for the delivery of the wastes to the nearest designated county waste treatment facility.
 
 
 26
 740 F.Supp. at 974 (emphasis added by district court). Again, the district court found that the tonnage figure referred to all the solid waste generated within the County. See id.
 
 Third, the 1974 Plan itself provided:
 
 27
 Under the terms of the U.S. court order that was issued directing the County and the EFC to take remedial steps, the County was directed to undertake studies, with a qualified consultant, leading to the development of a plan for alternate sites for waste disposal, the recovery of resources from the solid waste stream in order to reduce that quantity, and to undertake other technical studies regarding the prudent operation of the sanitary landfill.
 
 
 28
 740 F.Supp. at 974 (emphasis added by district court). The 1974 Plan also described itself as "predicated on the concept that the local officials have meant what they have said over the recent years: that there is a need for the County to assume primary responsibility for solid waste disposal."
 
 
 29
 Fourth, the Board, in its unanimous resolution adopting the 1974 Plan, stated: "The County of Westchester will assume the total responsibility for the disposal of all solid waste generated within the municipalities of the County." 740 F.Supp. at 974 (emphasis added by district court).
 
 
 30
 Thus, the district court concluded that: "Paragraph V of the Consent Decree was predicated on the County's prior assertions as to the scope of its responsibility for disposal of all of its waste and the Government relied on these assertions when it entered into the Consent Decree." 740 F.Supp. at 974. The district court further determined that the County had failed to carry out this responsibility. Id. at 982. Specifically, the court pointed out that by its own estimates, the County was generating approximately 200,000 tons of solid waste beyond Charles Point's capacity, including approximately 100,000 tons of construction and demolition waste. Id. at 975.
 
 
 31
 On August 17, 1990, the district court entered a "Final Order of Contempt." The County was ordered to pay a fine of $1,000,000, plus an additional $10,000 per day from the date of entry of the order until compliance therewith. In addition, the County was ordered to devise and implement long-term plans for the disposal of all solid waste in the County, to deliver a draft long-range plan to federal and state authorities within 120 days, and to pay for the United States to hire a consultant to evaluate the County's proposal. The order provided that the County could purge its contempt by filing an adequate, fully developed long-range plan, containing a schedule of milestone events, within six months of the entry of the order.
 
 
 32
 This appeal followed. At oral argument, we granted the County's motion to stay the imposition of fines and penalties pending our determination of this appeal.
 
 Discussion
 
 33
 On appeal, the County contends that (1) the district court misinterpreted the County's obligations under paragraph V of the Decree, and (2) in any event, the United States failed to demonstrate the County's violation of an unambiguous provision of the Decree. Before considering these claims, however, we first address the United States' challenge to our jurisdiction to hear this appeal.
 
 
 34
 A. Appellate Jurisdiction.
 
 
 35
 The United States contends that the district court's "Final Order of Contempt" is not a "final decision[ ]" within the meaning of 28 U.S.C. § 1291 (1988) because contempt sanctions are imposed only if the County fails to purge its contempt within six months after the order is entered. We are therefore urged to conclude that the proper time for appeal is after the six-month period has expired and the district court has assessed the County's compliance. We decline to do so.
 
 
 36
 This court has previously rejected the notion that the opportunity for purgation vitiates the finality of a contempt citation. In Vincent v. Local 294, Int'l Bhd. of Teamsters, 424 F.2d 124, 127 (2d Cir.1970), "[a]n order and adjudication in civil contempt was entered ... directing appellant to purge itself of civil contempt by fully complying with [a prior] injunction order, and upon failure to do so, to pay a fine of $200 a day for every day it continued in noncompliance with that order." We held that an appeal was proper under section 1291, explaining that "a finding of non-appealability would effectively foreclose any review of the issues involved in the contempt order," and "leave [the appellant] subject to continuing liabilities under the civil contempt order" despite our conclusion that the underlying injunction had expired. Id. at 128. We accordingly applied the rule that "[w]here ... civil contempt proceedings are instituted after the conclusion of the principal action rather than during the pendency of the action, the order disposing of the contempt proceedings is appealable." Id.; see also New York v. Shore Realty Corp., 763 F.2d 49, 51 (2d Cir.1985) (allowing appeal from contempt order imposing $1,000 per day fine).
 
 
 37
 Shuffler v. Heritage Bank, 720 F.2d 1141 (9th Cir.1983), ruled similarly, stating that: "Even though the size of the [$500 per day] sanction imposed by the order depends upon the duration of contumacious behavior occurring after entry of the contempt order, the order is nonetheless final for purposes of section 1291." Id. at 1145. As the Eleventh Circuit has observed in holding such a contempt order appealable as a final decision:
 
 
 38
 In imposing a prospective fine scale, the court hopes that the threat of fines will coerce compliance so that actual imposition of fines is not necessary. Thus, while in one sense a prospective fine schedule is a conditional future sanction, it also serves as an unconditional present sanction. Being placed under the threat of future sanction is a present sanction.... [A] party under a specific threat of future sanctions is in a different, more serious, often worse situation than one not under such a threat, even if the future sanctions are never imposed. In at least one sense, then, the ... order imposes a present remedy and hence is appealable.
 
 
 39
 Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1533 n. 2 (11th Cir.1986).
 
 
 40
 Even if the district court's judgment of contempt could be considered interlocutory, furthermore, it would nonetheless be appealable under 28 U.S.C. § 1292(a)(1) (1988). Since we hereinafter conclude that the district court misconstrued the injunctive mandate contained in paragraph V of the Decree, the court was "modifying" that injunction, within the meaning of section 1292(a)(1), by ordering compliance with its misinterpretation. See International Ass'n of Machinists v. Eastern Airlines, Inc., 849 F.2d 1481, 1485-86 (D.C.Cir.1988); Sizzler Family Steak Houses, 793 F.2d at 1533 n. 1; Motorola, Inc. v. Computer Displays Int'l, 739 F.2d 1149, 1155 (7th Cir.1984).
 
 
 41
 We turn to the merits.
 
 
 42
 B. Interpretation of Paragraph V.
 
 
 43
 1. Governing Principles.
 
 
 44
 To reiterate, we are called upon to review the district court's determination that paragraph V of the Decree required the County to formulate and implement plans enabling it to dispose of all solid waste generated within the County, including privately collected waste and construction and demolition debris. This interpretation of the consent decree is subject to our de novo review. See United States v. International Bhd. of Teamsters, 931 F.2d 177, 182 n. 1 (2d Cir.1991); United States v. Western Elec. Co., 900 F.2d 283, 293 (D.C.Cir.) (per curiam), cert. denied, --- U.S. ----, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990); Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir.1985).
 
 
 45
 In United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the Supreme Court made clear that it is the language of a consent decree that defines the obligations of the parties:
 
 
 46
 Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.
 
 
 47
 Id. at 681-82, 91 S.Ct. at 1757 (footnote omitted).
 
 
 48
 The Court has also specified, however, that resort may be had to extrinsic evidence in interpreting the governing language of a consent decree:
 
 
 49
 Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of Armour.
 
 
 50
 United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975) (footnote omitted). Relying upon general contract principles, we have said that "[e]xtrinsic evidence ... may generally be considered only if the terms of the judgment, or of documents incorporated in it, are ambiguous." SEC v. Levine, 881 F.2d 1165, 1179 (2d Cir.1989).
 
 
 51
 2. The Language of Paragraph V.
 
 
 52
 We look first, accordingly, to the language of paragraph V. The obligation "to devise long range plans for solid waste disposal for Westchester County" does not, in our view, connote an unqualified undertaking. As an initial matter, nothing in that language indicates an intention that the County itself be responsible for disposing of all solid waste within its borders. Had it successfully bargained for such an expansive commitment, the United States could be expected to have had it explicated in plain terms. In fact, the parties hammered out detailed directives elsewhere in the Decree with respect to the County's specific remedial obligations concerning the pollution emanating from the Croton Point dump.
 
 
 53
 Furthermore, while the district court properly found it "obvious that the intent was not to have the County hire a consultant to sit in a room and to devise plans that would not be implemented," 740 F.Supp. at 972, a general commitment to devise plans is not ordinarily understood as guaranteeing a specific result or undertaking. Indeed, the balance of the paragraph suggests flexibility. The plans were to be based upon the County's ongoing studies, and resource recovery was required only if "economically feasible."
 
 
 54
 The district judge's questioning at the oral argument of the contempt motion perceptively challenged the practicality (and thus the likelihood) of the County's assumption of an absolute responsibility for all solid waste, as the following colloquy makes clear:
 
 
 55
 THE COURT: The county's attorney says they ... faced the reality that the private developers would not agree at that time to join in the [Charles Point] plan and so they, therefore, built a facility which reflected the fact that only certain municipalities would cooperate with such a plan, that they didn't have the power to compel these private carters to use that facility. What do you say to that?
 
 
 56
 [Assistant United States Attorney] SILVERMAN:
 
 
 57
 ....
 
 
 58
 There is nothing in the consent judgment that says if things change and the private carters don't want to be involved, the county no longer has the responsibility to make sure there is a solid waste disposal system within Westchester County that can encompass what the solid waste needs will be or the solid waste that will be generated by Westchester County.
 
 
 59
 ....
 
 
 60
 THE COURT: [N]otwithstanding the fact that the private carters wouldn't sign up and a number of municipalities wouldn't sign up, they should nevertheless build a larger facility?
 
 
 61
 MR. SILVERMAN: Yes.
 
 
 62
 We cannot accept this view. It is one thing to address, in the planning mode, the overall needs of Westchester County for waste disposal. It is quite another to proceed, in the absence of adequate commitments from municipalities and private carters, to build a facility capable of handling the totality of committed and uncommitted waste. A capital project of this nature is typically financed by the issuance of revenue obligation bonds. How are the bonds to be underwritten and sold in the absence of adequate user commitments to generate the cash flow needed to finance the debt service on the bonds?
 
 
 63
 There is no dispute that municipalities and private carters could not be compelled to use the Charles Point facility. Accordingly, in view of its impracticality, a requirement that the County implement the construction of a facility capable of disposing of all solid waste in Westchester County, without regard to the adequacy of use commitments by those from whom the revenues to finance the facility must be generated, would have to be stated very explicitly to warrant judicial enforcement. An undertaking "to devise long range plans for solid waste disposal for Westchester County" falls well short of satisfying this standard.
 
 
 64
 We realize, of course, that prudent provision was probably feasible for some capacity in excess of the explicit commitments existing at the time when initial financing plans had to be finalized. Indeed, it is evident that such planning occurred with respect to the Charles Point facility. It is equally evident, however, that a totally open-ended commitment, based solely upon the amount of waste generated by all sources in the County and disregarding the actual commitments for disposal at the facility, would be thoroughly impractical. In the absence of a far more explicit obligation than appears in this record, it is for the responsible officials of the local government, and not federal attorneys and judges, to strike the balance.
 
 
 65
 We derive further support for this conclusion from the primary focus of the Decree and the "circumstances surrounding [its] formation." ITT Continental, 420 U.S. at 238, 95 S.Ct. at 935. The parties were settling a lawsuit that aimed primarily to terminate and remedy the discharge of leachate from the Croton Point landfill. To that end, the bulk of the Decree specifies the County's obligations to halt the expansion of, and the discharge of pollutants from, the landfill. By contrast, paragraph V, in a single sentence, simply directs that the County "devise long range plans for solid waste disposal for Westchester County," obviously with a view to the eventual closing of the Croton Point dump. In this context, we cannot conclude that this quite general mandate reflects an intention to impose the rather extraordinary disposal burden for which the United States contends.
 
 
 66
 3. The Extrinsic Evidence.
 
 
 67
 As the district court explicitly recognized, the extrinsic documents upon which it relied in interpreting paragraph V all constituted "prior assertions" regarding the County's intentions with respect to solid waste disposal. 740 F.Supp. at 974. At the outset, accordingly, it is significant that the Decree "neither incorporated the [documents] by reference nor provided that those [documents] could be looked to for assistance in interpreting the terms of" the Decree. Levine, 881 F.2d at 1180.[1]
 
 
 68
 Furthermore, we believe that the district court's use of the existing documents went beyond the realm of permissible interpretation. As we explained in Taitt v. Chemical Bank, 810 F.2d 29, 33 (2d Cir.1987), it is "error for the court to interpret [an extrinsic document] in a manner that departs from the bargain struck by the parties and recorded in the decree." We have found no language within the four corners of the Decree that fairly supports a commitment by the County to develop the capacity to dispose of all solid waste in Westchester. Accordingly, we view the district court's reliance upon the extrinsic documents as constituting not an appropriate interpretation of the Decree, but rather a rewriting of the Decree to conform with the court's perception of the parties' intent.
 
 
 69
 The extrinsic documents upon which the district court relied can fairly be read to establish an anticipation, prior to the execution of the Decree, that the County would endeavor to address the entire solid waste problem in Westchester County, although there is ambiguity regarding waste collected by private carters, and at least some countervailing evidence on that issue.[2] In any event, given the total context in which the parties agreed to the Decree, this evidence does not suffice to convert the County's commitment "to devise long range plans for solid waste disposal for Westchester County" into an undertaking to dispose of all such waste without regard to the practical and legal feasibility of doing so in the light of future, and necessarily unpredictable, developments regarding the financing of the Charles Point facility and the willingness of municipalities and private carters to commit to that facility.
 
 
 70
 4. Standards for Contempt.
 
 As we have stated, parties
 
 71
 may be held in civil contempt for "failure to comply with an order of the court if the order being enforced is 'clear and unambiguous, the proof of noncompliance is "clear and convincing," ' and [they] have not 'been reasonably diligent and energetic in attempting to accomplish what was ordered.' " EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n, 753 F.2d 1172, 1178 (2d Cir.1985), aff'd, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (citations omitted).
 
 
 72
 EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 594 (2d Cir.1991); see also Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir.1988); Powell v. Ward, 643 F.2d 924, 931 (2d Cir.) (per curiam), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).
 
 
 73
 No "clear and convincing" proof of noncompliance with a "clear and unambiguous" order has been provided in this case. We therefore reverse.
 
 Conclusion
 
 74
 The order of contempt is reversed.
 
 
 
 [1]
 The United States contends that the 1974 Plan was incorporated by reference into paragraph V because the plan was developed in accordance with consulting agreements referenced in that paragraph. The reference in paragraph V to studies leading to future "long range plans for solid waste disposal for Westchester County" cannot plausibly be read as incorporating by reference the already existing 1974 Plan
 
 
 [2]
 The County points, for example, to diagrams of waste flows attached to the 1974 Plan that included dotted lines and question marks with respect to privately collected waste