UNITED STATES of America, Plaintiff,

v.

Andrew O'ROURKE, as County Executive of the County of Westchester; Joseph Caverly, as Commissioner, Parks, Recreation and Conservation of the County of Westchester; The County of Westchester; and New York State Environmental Facilities Corporation, Defendants.

No. 72 Civ. 1964 (CBM).

United States District Court, S.D. New York.

June 14, 1990.

As Amended July 9, 1990.

**970**

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City by Robert Gaffey, Ellen B. Silverman, Nancy G. Milburn, Asst. U.S. Attys., for U.S.

Marilyn J. Slaatten, Westchester County Atty., White Plains, N.Y. (Paul D. Sirignano, Sr. Asst. County Atty., of counsel), for defendants Andrew O'Rourke, Joseph Caverly and County of Westchester.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

### I. INTRODUCTION

This action is now before the court as the result of a contempt motion made by the plaintiff, United States of America, pursuant to Rule 43 of the Civil Rules of this court.[1] The contempt motion seeks to hold the defendant, Westchester County (the "County"), in contempt for failure to comply with its obligations set forth in the Consent Decree entered by this court in December 1975. For the reasons set forth below, this court grants the motion of the plaintiff, finds the defendant in contempt of the 1975 Consent Decree, and gives the defendant six months to purge itself of contempt.

The portion of the Consent Decree that is at issue is Paragraph 5 which provides as follows:

The County is permanently enjoined and required to continue to completion the consultation agreement now being performed by the Environmental Facilities Corporation with respect to recycling of solid waste and resource recovery and on the basis of this study by the Environmental Facilities Corporation and any other pertinent and available studies and in consultation with DEC to devise long-range plans for solid waste disposal for Westchester County, which plans shall

include resource recovery, if economically feasible.

In 1972, the United States filed a Complaint against the County of Westchester, seeking to enjoin the County from continuing to operate the Croton Point Landfill and to force the County to close the Landfill. The Landfill is located next to a marsh which is on the banks of the Hudson River. Since 1934 the Landfill had served as the only solid waste disposal site in the County for municipal, commercial, and construction and demolition waste for all solid waste generators in the County.

In the 1960s and '70s, the County's use of the Landfill greatly increased. The Landfill continued to be the repository for most of the solid waste from the County. The various municipalities within the County and over 100 private carters used the Landfill for municipal waste, commercial waste and construction and demolition debris.

The Complaint filed by the Government in 1972 alleged that the manner in which the County operated the Landfill resulted in the pollution of over one hundred acres of marsh lands and tidal streams; specifically, a noxious and dangerous liquid byproduct of solid waste, referred to as leachate, flowed out into the marsh lands and the Hudson River. The ground water below the Landfill was also polluted with this leachate which in turn had polluted the adjacent low lying marsh lands and the Hudson River.

In response to the Complaint, the County opposed the closing of the Landfill, claiming it would be irreparably damaged if it was closed because the Landfill was the only repository for solid waste for the County.

In 1972, the County submitted to the court (Frankel, J.) a letter outlining the County's solid waste problems. The first problem was to provide for the end of the Croton Point Landfill. The second problem was to build upon the Landfill some kind of public recreational facility. The third problem was to find some substitute for the

---

1. (a) A proceeding to adjudicate a person in civil contempt of court, including a case provided for in Rule 37(b)(2)(iv), Federal Rules of Civil Procedure, shall be commenced by the service of a notice of motion or order to show cause. The affidavit upon which such notice of motion or order to show cause is based shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby, and such evidence as to the amount of damages as may be available to the moving party....

Landfill, i.e., some substitute repository for solid waste.

For purposes of the instant motion, the most significant thing the County told the court in 1972 was that the County had assumed full responsibility for the disposition of all of the solid waste for Westchester County. Although there was no statute that required the County to assume full responsibility, the County nevertheless assumed this responsibility voluntarily.

Pursuant to the foregoing representations by the County, the court issued an order that provided, among other things, that the County was to use consultants to generate reports and devise some plan for solid waste disposal.

In 1974, two years later, the County submitted to the court a plan for solid waste management, whereby the County again assumed full responsibility for all solid waste in Westchester County. This plan was predicated on the *temporary* use of the Landfill. The plan provided that the Landfill would be used for a period of three or four years, at which point the Landfill would be closed and some other facility would be used as the repository for solid waste.

In 1974, the County Board of Legislators adopted a resolution to the effect that it would introduce a solid waste program. It expressly stated that the County would assume responsibility for all solid waste within the County.

In 1975, three years into this litigation, and after extensive negotiations, the County and the Government entered into a Consent Decree. The Consent Decree required, among other things, that an expert be appointed by the court who would determine the capacity of the Landfill, how high it could go, and to what extent the Landfill could still be used. In the meantime, it required the County to devise long-range plans for solid waste disposal.

At some point after 1975, the County decided it would increase the capacity of the Landfill. The court-appointed consultant had concluded that the Landfill could be 110 feet. The County hired a different consultant and that consultant found the Landfill's capacity to be 140 feet. After negotiations, both the Federal and State governments agreed that the Landfill could properly reach 140 feet. However, it was never agreed by any of the parties that the Landfill could continue to remain open for a very long period of time. The agreement remained that the Landfill was to be closed as expeditiously as possible and that some other solid waste repository would be found.

In 1984, the County contracted with a private facility known as Charles Point in Peekskill. This facility is an incinerator. The County contracted with Charles Point so that the County could burn 550,000 tons of solid waste at Charles Point per year. In 1974, the County estimated that it had generated 900,000 tons of solid waste per year. Charles Point would only take care of 550,000 tons. The County began using Charles Point in 1985 for solid waste disposal. Charles Point does not accept construction and demolition debris, which accounted in 1985 for 58,000 tons. Other than the Landfill, there is no place in Westchester County for construction and demolition debris.

In 1985, the County diverted 150 tons of solid waste which could not be received at Charles Point, to the Croton Point Landfill. In short, the County was still using the Landfill in 1985, ten years after the Consent Judgment was entered, when it contracted with Charles Point.

In the first six months of 1986 the County diverted over 60,000 tons of solid waste to the Landfill. In 1986, the Government engaged in extensive discovery with the County over the use of the Landfill and closing of the Landfill. There were depositions in which employees of the County basically had admitted to leachate being discharged into the Hudson River. Very soon after those depositions, the County decided to close the Landfill.

The County Executive testified at his deposition that the closing of the Landfill had nothing to do with the Consent Decree, that solid waste disposal was the concern of the County, and that the Landfill had reached capacity and had to close down. When the County closed the Landfill in 1986, the only repository for solid waste

was Charles Point which by the County's own calculations was insufficient to handle the solid waste generated in Westchester County.

In 1987, the Government moved for contempt of the Consent Decree based on two violations; the first alleged violation was that the County was discharging leachate into the Hudson River; the second alleged violation was that the County has failed to devise any long-range plans for solid waste disposal.

In December 1989, on the eve of a hearing on the contempt motion, the Government and the County settled the leachate question. The County agreed to hire a leachate consultant who would determine the extent of the leachate problem with respect to restoration of the area. They agreed to hire a marsh consultant who would review the degradation of the area due to the pollution and what restoration and remediation was required.

The one issue that could not be settled was the solid waste issue. The response of the County to the contempt motion was: one, it had not assumed responsibility for all solid waste in Westchester County and, two, even if it had assumed responsibility, it has done all it was required to do under Paragraph 5 of the Consent Decree. The County's claim is that by its agreement with Charles Point, it has developed a solid waste plan for the County and that it is continuing to do so. The County noted that it had appointed a Solid Waste Task Force and had hired a Solid Waste Consultant.

■ Having so noted its recent actions, the County then took the position in its opposition papers that Paragraph V of the Consent Decree simply requires that it devise a plan and does not require the County's plan so devised to be implemented.

The court agrees with the Government that such a reading of Paragraph V is just contrary to all common sense. In view of the history of the case prior to Paragraph V and the Consent Decree of which it is a part, it is obvious that the intent was not to have the County hire a consultant to sit in a room and to devise plans that would not be implemented.

■ The court also agrees with the Government that even if you take the County's reading and say that all it had to do is devise a plan, it still has not done so. All it has done is to contract with Charles Point which is inadequate and does not take into account the County's long-range solid waste disposal needs. In 1984 the capacity at the Charles Point Facility was 670,000 tons. The County contracted to burn 550,000. The remainder was diverted to the Landfill or shipped to a site in Pennsylvania. The County now refuses to accept responsibility for commercial waste and construction and demolition waste. It believes its responsibility is limited to the waste generated by the various municipalities in the County with which it has contracted. It does not have a contract with all of the municipalities in the County.

In 1984, the County generated approximately 840,000 tons of solid waste but had estimated in 1974 that it would generate 900,000 by 1984. The Landfill was still open in 1984, into which the additional 60,000 tons was diverted. At the time of the hearing on the motion in April 1989, the County was still generating approximately 840,000 to 900,000 tons of solid waste. The actual figure in 1987 was 842,000 tons of solid waste. The County's own consultant estimates that by the year 2,000 the County will be generating 980,000 tons of solid waste which includes municipal waste, private commercial waste and construction and demolition debris.

## II. FINDINGS OF FACT

1) The Consent Decree required the County to close the Landfill as soon as it reached its capacity, that capacity to be decided by court-approved experts within six months of the entry of the Consent Decree. Gov't Ex. 1, Paragraph III B.

2) In this interim phase, during which the County was allowed to operate the Landfill until it reached the capacity decided by the court-approved experts, the final Consent Decree ordered the County "to devise long range plans for solid waste disposal for Westchester County, which plans shall include resource recovery, if

economically feasible." Gov't Ex. 1, Paragraph V.

3) The County now has admitted that the Consent Decree obligated the County to *devise and implement* long range plans for County-wide solid waste disposal. Oral Argument Transcript (April 28, 1989), pp. 34–36; 37; 39–40.

4) There is no evidence in the record to demonstrate that prior to 1981, the County devised or implemented any plans whatsoever, long range or otherwise, for an alternative solid waste repository to the Landfill.

5) In response to the Government's initial motion for a preliminary injunction in this action seeking, among other things, to close the Landfill, the County claimed that closing the Landfill—its only repository for solid waste—would cause the County irreparable harm. Gov't Ex. 15, pp. 4–5.

6) The County's immediate response to the Government's request for preliminary relief was as follows:

> The County's position is that we admittedly have a problem, and one to which we have been seeking a three-fold program: first, to provide for an end of all disposal at Croton Point as quickly as possible; second, to install recreational facilities on the resulting fill; thirdly, *to provide a substitute method for the eventual disposition of the county's solid waste, now 2,500 tons a day.*

Gov't Ex. 36 (emphasis added), p. 1.

7) The 2,500 ton per day figure included municipal, commercial and construction and demolition waste. Gov't Ex. 36, p. 1.

8) Having thus represented to the court that the County understood and accepted the need to replace the Landfill as the sole repository for waste generated within the County, the County Attorney emphasized, in opposing the Government's application for injunctive relief, that the County had already undertaken the obligation to dispose of all of the County's waste as its own responsibility:

> Waste disposal by state law is not a county responsibility, but that of the cities, towns and villages, but the county has assumed the obligation because the local communities cannot do so and have asked the county to handle the function.

Gov't Ex. 36, at p. 1.

9) On June 6, 1972, the court entered an order (the "1972 order") that, in essence, granted the Government's motion. Gov't Ex. 16.

10) The County was also ordered to submit monthly reports to the court on its compliance with the 1972 Order. In these monthly reports, the County reported that it had engaged the services of Leonard S. Wegman Co. ("Wegman") and the Environmental Facilities Corporation ("EFC") for the "formulation of a comprehensive county-wide solid waste management plan for review and adoption by the County." Gov't Ex. 37, Ex. A (# 1)

11) Finally, two years after the entry of the 1972 Order, the County submitted to the court with its Twenty–Fourth Report, a plan based upon studies conducted by Wegman and the EFC. Gov't Ex. 38 (entire report)

12) The 1974 Plan was predicated upon temporary use of the Landfill for a few more years until an all-encompassing solid waste disposal plan was constructed to replace it:

> The plan envisions an "interim" phase between now and 1978 and a "continuing phase" *when the full spectrum of resource recovery systems have been established.* During the interim phase, it is recognized that the continued use of the Croton Point sanitary landfill will be necessary in order to give the County sufficient time to construct a feasible and economic system of resource recovery facilities. However, it is contemplated that the operations there will be ended as soon as possible and the landfill site restored to a useful recreation facility.

Gov't Ex. 38, p. 2. (Emphasis added).

13) In transmitting the 1974 Plan to the Westchester Board of Legislators for its adoption, then County Executive Alfred B. Del Bello described the "basic elements" of the plan as including, *inter alia:*

*I. County Responsibility*

*The County of Westchester will assume the total responsibility for the disposal of the 900,000 tons per year of solid waste generated by the County's municipalities.* The methods of disposal will be consistent with the highest environmental standards. The municipalities will continue to be responsible for the collection of the wastes within their borders, and for the delivery of the wastes to the nearest designated county waste treatment facility.

*Id.* Section I of Plan, pp. 8–9. Del Bello letter 5/7/74 (emphasis added).

14) The 900,000 figure referred to in the 1974 Plan was the County's estimate for municipal, commercial and construction and demolition waste. Gov't Ex. 38, Section III, DEC and EFC Study, April 1974, p. iii, attached to Plan.

15) In the process of taking total responsibility for waste disposal, the County planned to "take over" existing municipally-owned solid waste disposal facilities, and to close the Landfill once the County's plan to replace it was put into effect. *Id.*, p. 2–3, 4 (2nd document)

15a) The 1974 Plan emphasized that the problem of disposing of all of Westchester's waste could be remedied "only ..." through the development of a County-wide Master Plan." *Id.*, p. 13, the Plan at p. 1.

16) To maintain its economic viability, the County insisted that the system must be "under County control, with the operation in the hands of those who are politically responsible for its successful implementation." *Id.*, p. 19, the Plan at p. 7.

17) The 1974 Plan estimated that, by 1980, Westchester would produce over one million tons per year of residential, commercial and industrial solid waste. *Id.*, p. 13, the Plan at p. 1.

18) In the 1974 Plan, the County expressly noted that this undertaking was required by the 1972 Order:

> Under the terms of the U.S. court order that was issued directing the County and the EFC to take remedial steps, the County was directed to undertake stud-

ies, with a qualified consultant, *leading to the development of a plan for alternate sites for waste disposal,* the recovery of resources from the solid waste stream in order to reduce that quantity, and to undertake other technical studies regarding the prudent operation of the sanitary landfill.

*Id.*, p. 15, the Plan at p. 3. (emphasis added)

19) Citing "county-wide demand for the County assumption of responsibility for solid waste disposal," the County reported that "[s]ince this is a county-wide problem, the solutions must be applicable countywide...." *Id.*, p. 22, the Plan at p. 10.

20) The 1974 Plan was "predicated on the concept that ... there is a need for the County to assume primary responsibility for waste disposal." *Id.*, p. 27, the Plan at p. 15.

21) On August 19, 1974, the County Board of Legislators unanimously adopted the 1974 Plan that had been submitted to the court, which made clear that the County had undertaken to dispose of *all* solid waste generated within the borders of Westchester County. The Resolution described the purpose of the 1974 Plan as follows:

> The County of Westchester will assume the total responsibility for the disposal of *all* solid waste generated within the municipalities of the County.

Gov't Ex. 3, p. 006975. (emphasis added)

22) Paragraph V of the Consent Decree was predicated on the County's prior assertions as to the scope of its responsibility for disposal of all of its waste and the Government relied on these assertions when it entered into the Consent Decree.

23) At a May 24, 1987 meeting with the mayors of several cities and a private resource recovery facility vendor, County Executive O'Rourke stated, in response to suggestion that the County, not municipal government, was responsible for disposing of garbage, that:

> The responsibility, indeed, is the County's and we live with that responsibility. We appreciate your help, but in the final

analysis you all may go back to your other duties tonight and we have to burn 100 tons of garbage. And we have to do it and everybody expects us to do it and we will do it.

Videotape shown at April 28, 1989 Oral Argument.

24) None of the evidence in the record suggests that the County informed the New York State Supreme Court, Westchester County, of the existence or substance of the Consent Decree in *Industrial Refuse Systems Inc. v. O'Rourke*, 134 Misc.2d 45, 509 N.Y.S.2d 988 (Sup.Ct. Westchester County 1986), *modified on other grounds* 129 A.D.2d 76, 516 N.Y.S.2d 940 (2d Dept.1987).

25) The Government's only participation in *Industrial Refuse* was limited to informing the state court by submission of a four page letter of the existence of the Consent Decree. Gov't Ex. 47.

26) The state court ruled

In their memorandum of law, plaintiffs claim that the rules established by Weber violate County Law article 5A. The underlying argument advanced in support is that it is the county's obligation [pursuant to New York state law] to transport and dispose of county-generated refuse. For reasons hereinafter discussed, the court disagrees with plaintiffs' position on this point. Parenthetically, the court notes that the United States Attorney has taken the position that prior Federal District Court litigation was resolved by imposition of this very obligation on the County. However, the United States Attorney's position was advanced by letter to the Court, the U.S. Attorney does not represent a party to this action, the material presented by him does not support the claim advanced by him and *the issue is not before this court in this action.*

*Industrial Refuse Systems v. O'Rourke*, supra, 509 N.Y.S.2d 988, 992 (emphasis added).

27) In 1978, when the County claims to have offered the municipalities and the private carters the opportunity to use the proposed but not yet built Charles Point facility, the Landfill was still open for some additional eight years later.

28) The Charles Point facility commenced operations in October 1984. Gov't Ex. 44, p. IX.

29) The County did not announce the closing of the Landfill until June 1986. Gov't Ex. 41, Weber Aff. (second in exhibit), p. 2.

30) The private carters cannot dispose of their construction and demolition debris at the Charles Point facility. Oral Argument Transcript (April 28, 1989), p. 39.

31) There is no evidence in the record to demonstrate that the County began devising adequate long range plans at any time prior to the filing of the instant contempt motion in August 1987. *See, e.g.*, Plaintiff's Proposed Findings of Fact, paragraphs 9, 15, 16, 23, 24, 27, 28, 39, 50–62.

32) The County admits that it did not formulate any plans to construct a recycling plant until 1989. County's Proposed Facts, paragraph 20.

33) There is no evidence in the record of such plans for a recycling plant.

34) There is no evidence in the record to indicate when the County will complete its "formulation" of the "plans" for the recycling plant, or when the County expects the recycling plant to be operational.

35) The County admits that the capacity of the recycling plant will be limited to only 52,000 tons of refuse per year. County's Proposed Facts, paragraph 20.

36) Because the new facility will not be a landfill, it will not be capable of disposing of construction and demolition debris. Oral Argument Transcript (April 28, 1989), p. 39.

37) By the County's estimates, the County generates approximately 200,000 tons of waste per year in excess of the capacity of the Charles Point Plant, which includes approximately 100,000 tons of construction and demolition waste. Gov't Ex. 54, p. 11; Gov't Ex. 57, pp. 3 (Table 1), 14 (Table 9), 15.

38) Even if there were a new plant, the County has not devised adequate long term solid waste disposal plans.

39) In the County's Proposed Facts, it states, without any citation to the record, that it has now

finalized an application for submission to the Department of Environmental Conservation ("DEC") to designate the County as the "planning unit" on a regional basis, for the entire County of Westchester

and recites New York State's "planning requirement," which must be complied with to be eligible for a grant to fund such planning. County's Proposed Facts, paragraphs 22, 24.

40) There is no evidence in the record to demonstrate that the County planned, prior to the filing of the instant contempt motion, to apply for "planning unit" status.

41) There is no evidence in the record, nor does the County state, whether the County has yet submitted its application to DEC or whether DEC has granted the County status as a "planning unit."

41a) In a Committee Report to the Board urging the Plan's approval, the Public Works Committee of the Board made clear that the 1974 Plan was developed pursuant to this court's 1972 Order:

The [1972 Federal] suit resulted in a court order requiring the County to upgrade the operations at the landfill and to investigate county-wide systems of resource recovery.

Gov't Ex. 2, p. 006970.

42) In December 1978, the site of Charles Point in the town of Peekskill was proposed as the location of a mass-burning waterwell incineration resource recovery facility (the "Facility"). To obtain the necessary financing for the Facility, the County needed to obtain commitments from municipalities that a guaranteed quantity of refuse would be delivered to the Facility. Gov't Ex. 44, pp. 105–06.

43) The County negotiated inter-municipal agreements ("IMAs") with the municipalities that agreed to commit a minimum quantity of refuse to the Facility. By Oc-

tober 1979, the County had entered into IMAs with 33 municipalities. This represented a commitment of an average tonnage of 370,000 tons per year and a minimum 330,000 tons per year. Subsequently, two additional municipalities entered into IMAs, thereby increasing the total quantity of municipally collected solid waste guaranteed under the IMAs to 419,000 tons per year. *Id.*

44) The IMAs required each municipality to pay a specified fee for each ton of refuse delivered to the Facility ("tipping fee"). Under the IMAs the County agreed to accept and dispose of all municipally collected solid waste of each participating municipality up to a specified maximum tonnage equal to 110% of the nominal commitment of the IMA participants, or an aggregate maximum amount of 461,150 tons per year. Based upon these estimates of committed tonnages, the County determined that a refuse recovery facility with a capacity of 550,000 tons per year would be necessary to accommodate the solid waste of the 35 municipalities who signed IMAs. Presently 36 municipalities have signed such IMAs. *Id.* at 121, Gov't Ex. 41, Gibbs Aff., p. 2.

45) The County of Westchester also approached the various private carters doing business within Westchester County to negotiate similar agreements in order that the tonnage handled by such private businesses could be added to the total tonnage commitment for the proposed Facility. Gov't Ex. 41, Gibbs Aff., pp. 6–7; Gov't Ex. 44, p. 115.

46) In June of 1981, a solid waste disposal agreement regarding the proposed development of the Facility was entered into between an agency of the County (the County of Westchester Industrial Development Agency) and Wheelabrator Frye, Inc. Thereupon, an entity known as "Resco" was formed to construct and operate the Facility. The Facility began accepting solid waste on October 22, 1984. Gov't Ex. 41, Gibbs Aff., pp. 4–5.

47) In conjunction with the construction of the Facility, the County was to design and implement an efficient system of stra-

tegically located transfer stations. The County also was to acquire a fleet of tractors and transfer trailers for waste hauling, and a landfill solely for the deposit of ash residue generated by the burning of solid waste at the Facility. There is no evidence in the record that these requirements have been met. Gov't Ex. 44, p. ix; Gov't Ex. 41, Miles Aff. (third in exhibit), pp. 4–5.

48) In 1986, the capacity of the Facility available to the County by permit was increased to 657,000 tons per year from 550,-000 tons per year. This represents 80% of the total potential capacity of the facility. *Id.* Gov't Ex. 41, p. 2. The County claims that it has since requested the New York State Department of Environmental Conservation to increase the operating permit for the Facility to 740,000 tons per year.

49) County Executive O'Rourke appointed a Solid Waste Task Force (the "Task Force") to investigate further and update past studies regarding the County's future solid waste disposal needs and alternatives for such disposal, including recycling. The consulting firm of Henningson, Durham & Richardson was retained to assist the County in conducting this study. The Task Force has investigated, among other things, the feasibility of constructing a second resource recovery facility or adding a fourth boiler to the Facility. Gov't Ex. 57.

50) This planning for the future, according to the County, has been, and still is, being conducted in conjunction with the New York State Department of Environmental Conservation.

51) Although no plans were submitted, the County claims that plans are now being formulated to construct a Material Recovery Plant within Westchester County at a cost of approximately ten million dollars. This type of facility, the County says, is intended to be utilized to remove all materials from the solid waste stream which can be reused and to recycle those materials which cannot be reused. The proposed two-story, 30,000 square foot center to be built in Yonkers, would cost an estimated 1.8 million dollars a year to operate and would handle 52,000 tons of refuse a year.

52) Charles Miles, the Solid Waste Division Director of Tonnage, estimated that the solid waste generated within the County during 1986 could exceed the County's annual contractual commitment at the Charles Point Plant by as much as 474,500 tons (1300 tons per day). Gov't Ex. 41 (Miles Aff. paragraph 5)

53) In 1984, soon after Charles Point opened, County Executive O'Rourke engaged the services of Mr. Ogden Reid to act as a Special Commissioner to investigate various matters relating to the Charles Point Plant, including whether it "was adequately planned to meet the needs of the County and whether it has sufficient capacity to meet the County's current and future needs." Gov't Ex. 44, p. x.

54) Commissioner Reid concluded that the County did not have the capacity to meet the County's current and future solid waste disposal needs. *Id.* pp. xi–xii.

55) After an extensive review of the County's estimate of its own waste disposal needs, the Reid Report noted, *inter alia,* that

> [t]he 657,000 ton capacity of the Charles Point facility is not sufficient for the disposal of all of the solid waste generated by the IMAs, the municipalities who have not yet signed IMA agreements and the private carters. Thus, if the County considers itself under a legal or moral obligation to dispose of the solid waste generated by the private carters, immediate attention must be given to building an additional plant or obtaining some other means to dispose of the excess solid waste.... In sum, we have concluded that completion of the Charles Point facility has not solved Westchester's solid waste problems and that those issues are going to require a great deal of attention in the years ahead.

*Id.* pp. xi–xii.

56) The Reid Report, citing the County's 1974 Plan for solid waste disposal and the responsibility the Plan recited for the disposal of 900,000 tons per year, observed "an important change in focus from the prior attention given [by the County] to the

total amount of solid waste generated in the county." *Id.* p. 105.

57) Rather than move ahead with the 1974 Plan submitted to this court, the Reid Report noted that the then-County Executive Alfred Del Bello instead proposed in 1978 that the County construct a plant capable of handling only 550,000 tons of waste per year and eliminated from the County's efforts *any* planning for commercially-generated solid waste. *Id.* at pp. 105, 114–15.

58) According to the Reid Report, the County has been aware since at least 1977 that such a plant as the facility at Charles Point would be insufficient to dispose of all the solid waste generated within Westchester County and in 1986 the County abandoned its obligations under the Consent Decree to provide for solid waste disposal county-wide. *Id.*

59) Malcolm Pirnie, Inc. ("MPI"), a consultant retained by the County, estimated that, by 1985, the County would generate approximately 783,000 tons per year of municipal and private solid waste. *Id.* p. 104.

60) Based upon this projection, MPI recommended that the County program include two resource recovery facilities, with a combined capacity of 2600 tons per day, to plan for the County's long-term waste disposal needs through the year 2000. *Id.* pp. 104–05.

61) Indeed, the actual quantity of waste generated in 1976, 716,000 tons, well exceeded the capacity of the Plant, which did not open until 1984. *Id.* at p. 104.

62) The Reid Report also stated that, to accommodate all of the waste generated within the County, "[the County] must immediately begin planning for added capacity at the plant or for some viable alternative disposition of the excess solid waste." *Id.* pp. 126–27.

63) The Reid Report further said that "the County should begin to make a realistic assessment of the solid waste being generated within the County and the reasonable projections for future growth ..." *Id.* p. 132.

64) The Report concluded that:

[It] should be clear that the present capacity of the plant is adequate to meet the current County needs for the solid waste it is obligated to accept [under its contractual commitment to the IMA municipalities]. It is also evident that the total solid waste generated within the County exceeds the capacity of the Charles Point facility. Thus, the completion of the Charles Point facility has not solved all of Westchester County's solid waste problems and those issues are going to require a great deal of attention in the years ahead.

*Id.* p. 134.

65) Up until June 1986, eleven years after the entry of the Consent Decree, the Landfill remained open. Gov't Ex. 45, p. 1.

66) From the opening of the Plant in 1984 until the closing of the Landfill in June 1986, the private carters had access to the Plant on a limited basis and to the Landfill. Gov't Ex. 44, p. 122.

67) When the County closed the Landfill, the private carters were abruptly eliminated from the County's "system" because the County had done nothing to plan for the vast amount of waste which, until that point, the private carters had been delivering to the Landfill. Gov't Ex. 45, p. 1.

68) The closing of the Landfill, more than eleven years after the entry of the Consent Decree, reveals that the County had failed to devise long range plans as required by that Decree, and had unilaterally abandoned its representations to the court to assume "total responsibility" for disposal of all solid waste generated within the County. Gov't Ex. 45.

69) When the Landfill finally closed, the County's waste disposal capacity was far short of the capacity it had promised this court it would put in place. Gov't Ex. 41, Weber Aff. (second in exhibit).

70) When the Landfill closed, a large and important component of the County's waste disposal "system" was removed and the County had devised nothing to replace it. *Id.*

71) With the closing of the Landfill, the County's waste disposal system is solely dependent on the Plant. *Id.*

72) Prior to its closing, the Landfill was "utilized to dispose of [such] solid waste, including construction debris and demolition material, which could not be disposed of at [the Plant]." *Id.* (Weber Aff., paragraph 4).

73) During 1985, the Landfill was the repository of 234,904 tons of solid waste that was either diverted from the Plant or consisted of construction debris, and the same tonnage was estimated for 1986. Gov't Ex. 44, Reid Report, p. 126; Gov't Ex. 43.

74) The County neither owns nor controls a "back-up" landfill to the Plant, even though its contract with the operator of the Plant requires the County to provide a back-up landfill to cover for breakdown and excess deliveries. Gov't Ex. 41 (Weber Aff., paragraph 5-6).

75) The only contingency arrangement the County has is an "informal arrangement" for the use of a landfill in Dunmore, Pennsylvania, approximately 120 miles away from Westchester. *Id.* (Weber Aff., paragraph 7).

76) The County waited until circumstances forced the Landfill to close and then denied any obligation to replace it. Mr. O'Rourke stated:

I don't recall the consent judgment having a big impact on us. We knew we had to close Croton someday. Just natural capacity limitations would cause us to close it and we tried to get everybody aware of what was happening.

Gov't Ex. 40, p. 113.

77) In June 1986, only a few weeks before the Landfill actually closed, the County Executive first formed a "Solid Waste Task Force" ("SWTF") to examine the County's "long-range" waste disposal needs. *Id.* p. 60.

78) The SWTF did not hold its first meeting until June 10, 1986—just three weeks before the closing of the Landfill. Gov't Ex. 40, p. 58; 60–64; Gov't Ex. 53.

79) There is no evidence in the record to demonstrate that the SWTF has yet rendered even a preliminary report merely recommending to the County Executive "possible alternatives on a county-wide planning basis." Gov't Ex. 40, p. 63.

80) Henningson, Durham and Richardson ("HDR"), the consultants working with the SWTF were not retained by the County until nearly two-and-a-half months after the Landfill closed and then only to devise a short-term contingency plan for the diversion of solid waste if the Peekskill plant should break down. Gov't Ex. 54, pp. 17–21, 23–24.

81) Even this short-term plan was based on the premise that the County is responsible only for the municipal waste it accepts pursuant to the IMAs. *Id.*

82) When John Rose, a principal of HDR was asked whether HDR had developed a long-term waste disposal plan for the County or had been asked by the County to do so, he answered "No." *Id.*, p. 25.

83) As of October 5, 1987, HDR still had not been told whether the County was going to retain HDR to develop a long-term plan. *Id.* pp. 33–34; 115–116.

84) The County has hampered HDR's ability to propose the development of a long-range plan for waste disposal, because the County has not advised HDR of the type or amount of waste to be accommodated by such a plan. *Id.* p. 29.

85) Eleven days before the Landfill closed, Calvin Weber, Deputy Commissioner for Solid Waste, wrote to the municipalities of Westchester that had entered into IMA contracts with the County to dispose of waste at the resource recovery plant. His letter informed the municipalities that the County's capacity for waste disposal was sharply limited:

The closing of the Croton Point Landfill will result in the reduction of the available disposal capacity of the solid waste management system to the permitted 657,000 tons per year capacity of the Charles Point Facility.

Gov't Ex. 45, p. 1.

86) The County informed the municipalities that:

It must be noted that the Refuse Disposal District does *not* accept responsibility for diversion of the supplemental tons in the event of a breakdown at the plant or if the plant cannot handle the supplemental tons for other reasons. Responsibility for diversion of supplemental tons will be that of the municipality. The District will continue to be responsible *only* for solid waste tonnage under the original IMA.

*Id.,* p. 2. (The "Refuse Disposal District" is a tax district created by the County to fund the operation of the Plant. All property owners within the district pay an *ad valorem* tax to support the Plant, including taxpayers whose waste is collected by private carters who have been barred from using it.) Gov't Ex. 41 (Gibbs Aff., paragraph 5(b)).

87) The County left to their own devices (i) the municipalities that collect waste in excess of their allotment at the Plant; and (ii) the private carters who collect all the waste in Westchester that is not collected by the municipalities themselves, or does not fall within the County's contractual obligations. *Id.* (Gibbs Aff.); Gov't Ex. 48, p. 4; Gov't Ex. 45, p. 2.

88) The County admitted:

The County has a finite capacity at its Charles Point Facility to dispose of the waste brought there. Moreover, the County has neither the manpower nor the equipment necessary to undertake handling *the vast excess tonnage of waste which the commercial carters seek to make the responsibility of the County.*

Gov't Ex. 41, Weber Aff., paragraph 8, p. 3.

89) In 1986, the private carters brought suit against the County based on the County's refusal to accept the private waste. *See Industrial Refuse Systems v. O'Rourke,* supra.

90) The state court dismissed the private carters' lawsuit on state law grounds. *Id.* The United States was not a party to that lawsuit. *Id.*

91) In that proceeding, the County admitted that

We are under a Federal Court order to close the Croton Landfill. Croton was our more or less pressure relief valve for the Peekskill facility. Everything that was not able to be handled at Peekskill was diverted to Croton. Now that we've closed Croton, *we don't have an effective means within the County for disposal of the overflow from Peekskill.* In addition, Croton handled things that the facility could not handle. Things like construction and demolition material. Things that are not capable of being burned and disposed of at the Peekskill facility.

Gov't Ex. 46, pp. 65–66. (Emphasis added).

92) The County lacked the necessary trucks, staff, contracts, back-up equipment and personnel to dispose of the waste that the Plant could not accept. Gov't Ex. 41 (Miles Aff., paragraphs 9–10).

93) The County had no allocation within its budget to secure the necessary equipment and manpower to dispose of its excess waste. *Id.,* paragraph 12; Gov't Ex. 46, pp. 61–64.

94) On June 16, 1986 the County began arrangements to allocate the limited remaining capacity at the Plant to waste that previously had gone to the Landfill. Gov't Ex. 45.

95) The County's refusal to develop long-range plans for all of the solid waste it generates leaves no plan, at all, for the disposal of hundreds of thousands of tons of solid waste. Gov't Ex. 42.

96) By the year 2000, the County estimated that it will generate a total of 980,-000 tons per year. Gov't Ex. 57, p. 14 (Table 9).

97) In 1986, Westchester generated 842,-000 tons of solid waste, including IMA waste, non-IMA waste and commercial and C & D waste. *Id.*

98) "Non–IMA" waste constitutes between 35–50% of the total waste generated in Westchester. Gov't Ex. 54, p. 32.

99) Commercial and C & D waste, for which the County disclaims any responsibil-

ity, amounts to hundreds of thousands of tons per year. Gov't Ex. 42.

100) C & D waste presently constitutes 100,000–150,000 tons of waste per year. Gov't Ex. 54, p. 33.

101) 100,000 tons of C & D material will require disposal on an annual basis, with possible peak years of as much as 150,000 tons. *Id.*

102) Measured against the County's allocation of only 550,000 tons per year at the Plant (or even the Plant's full permitted capacity of 657,000 tons per year) the County's own consultant has concluded that "the County is confronted with a potential crisis in solid waste disposal capacity." Gov't Ex. 57, pp. 14–15.

103) The Croton Point Facility, as the sole component of the County's waste disposal system, is simply not capable of disposing of all the waste for which the County should have been planning since the Consent Decree was entered in 1975. Gov't Ex. 54, pp. 21–23.

104) The County has recently stated that it now has plans for a resource recovery facility but has never informed the United States of these plans or provided these plans to the United States. Oral Argument Transcript (April 28, 1989), pp. 31–32.

105) Under one "plan," the County would publicly offer to accept commercial waste into the County system, but on terms made deliberately too burdensome for the municipalities to accept. In a memorandum to file recording discussions with County Officials Charles Miles and Anthony Carbone, HDR Consultant John Rose wrote, with respect to this "Supplemental Tonnage Proposal":

> One approach is to implement the policy, but with put-or-pay provisions that would be so onerous that the municipalities will say thanks-but-no-thanks. *That way the County will appear to be willing to do something for the commercial waste generators, but the municipalities would be blamed.*

Gov't Ex. 59, p. 3 (emphasis added).

106) County Commissioner for Public Works Frank Kearney "suggested that no contingency plan be enacted, based on the operating history of the [resource recovery plant]," and instead, suggested that, if a failure occurred at the plant, DEC "could be contacted ... and petitioned to open Croton." Gov't Ex. 60.

107) There is no evidence in the record to show that the County ever petitioned this court for a modification of the Consent Decree.

### III. CONCLUSIONS OF LAW

1) In a motion for civil contempt, the Government must show by clear and convincing evidence that defendants have not complied with the court's order. *N.A. Sales Co., Inc. v. Chapman Industries,* 736 F.2d 854, 857 (2d Cir.1984). Even lack of intent to violate the court decree is not a defense. The issue is simply whether the Decree has been violated. *See e.g., McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499–500, 93 L.Ed. 599 (1949); *NLRB v. Int'l Brotherhood of Teamsters,* 428 F.2d 994, 1001 (2d Cir.1970).

2) A finding of contempt is warranted where, as in this case, "defendants violated their obligations under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals." *Powell v. Ward,* 487 F.Supp. 917, 933 (S.D.N.Y.1980), *aff'd on this point,* 643 F.2d 924, 931 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981), *quoting Aspira v. Board of Education,* 423 F.Supp. 647, 651 (S.D.N.Y.1976).

3) The Supreme Court has provided explicit guidance regarding how the meaning is to be derived from the four corners of a consent decree:

> [S]ince a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such

reliance does not in any way depart from the "four corners" rule in *Armour.* [*United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)].

*United States v. ITT Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). *Accord Taitt v. Chemical Bank,* 810 F.2d 29, 32 (2d Cir.1987); *Berger v. Heckler,* 771 F.2d 1556, 1567–68 (2d Cir. 1985); *New York State Ass'n for Retarded Children v. Carey,* 596 F.2d 27, 37 (2d Cir.1979); *Duracell Inc. v. Global Imports, Inc.,* 660 F.Supp. 690, 692 (S.D.N.Y. 1987).

■ 4) By the terms of the Consent Decree, the County was and is obligated to devise and implement long range plans for solid waste disposal, including commercial waste and construction and demolition debris. Oral Argument Transcript (April 28, 1989), pp. 34–50.

5) The record discloses that the parties intended that the County be responsible for the disposal of all solid waste in the County including municipal, commercial, and construction and demolition waste. *Id.,* p. 47.

6) The record shows by clear and convincing evidence that the County has not to this day devised and implemented adequate long-term plans to handle county-wide solid waste disposal. *Id.* at pp. 31–32; Gov't Ex. 44.

7) The record shows by clear and convincing evidence that the Charles Point Plant is not sufficient to handle the solid waste disposal for the County. *See e.g.,* Gov't. Ex. 44.

8) Because the record shows by clear and convincing evidence that the County has failed to devise a solid waste plan to accommodate all county solid waste, including construction and demolition debris, the County is in contempt of the Consent Decree.

9) "A district court has broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative sanctions". *N.A. Sales Co.,*

*Inc. v. Chapman Industries,* 736 F.2d 854, 857 (2d Cir.1984).

10) This court is disturbed by the defendants' lack of diligence and commitment in taking the steps necessary to achieve compliance. *Powell v. Ward,* 487 F.Supp. 917, 933 (S.D.N.Y.1980), *aff'd,* 643 F.2d 924, 931 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).

11) The language of the Consent Decree in Paragraph V is clear on its face as to the County's responsibility to devise and implement long range plans. The court has been required to ascertain the intent of the parties on the issue of whether the long range plans were to encompass *all* solid waste, including municipal, commercial (private) and construction and demolition (public and private).

■ 12) The County cannot ignore its own representations to the court to avoid compliance with the Consent Decree. *See Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 646 F.2d 800, 809 (2d Cir.1981) (reference in consent decree to *extrinsic* exhibits which demonstrated contemnor's "grasp of [the] documents and its complete acquiescence in reference to them"; contempt citation affirmed).

13) The self-serving affidavits of County Commissioner of Planning Peter Q. Eschweiler and former County counsel William F. Koegel are nothing more than statements of "what might satisfy the purposes of one of the parties to" the Consent Decree and therefore are immaterial. *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971).

■ 14) Any rulings in *Industrial Refuse,* supra, are legally irrelevant to this motion because collateral estoppel cannot be applied against a non-party to a lawsuit. *Parklane Hosiery v. Shore,* 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979); *See Staten Island Rapid Transit Op. Auth. v. I.C.C.,* 718 F.2d 533, 542 (2d Cir.1983). Because the Government was not a party to *Industrial Refuse,* it is not bound by any rulings therein. *Id.*

15) In *Industrial Refuse,* the state court merely held that the County is not *required* under state law to be responsible for solid waste disposal; it in no way prohibits such an obligation.

16) The basis of the County's responsibility for waste disposal is its agreement, embodied in the Consent Decree, to undertake that responsibility. "Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment, at all ... [m]ore importantly, it is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Local Number 93, International Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986).

17) The state court in *Industrial Refuse* did not rule on the County's obligations under the Consent Decree.

18) Even if the requirements of the Consent Decree were somehow in conflict with state law, the County would nonetheless be required to abide by the federal judgment under constitutional principles derived from the supremacy clause. *Badgley v. Santacroce,* 800 F.2d 33, 38 (2d Cir. 1986).

19) The County was in contempt of Paragraph V of the Consent Decree at the time of the filing of the instant motion and is still in contempt.

20) Because of the County's contempt of the Consent Decree, the County will be ordered to pay a fine and to devise and implement long-term solid waste plans for all solid waste in Westchester County, including commercial, construction and demolition waste, in accordance with a court-ordered schedule of milestone events, unless within six months of the date of the Final Order on this motion, the County has purged itself of contempt by filing with the court an adequate, fully developed long-range plan, containing a schedule of milestone events with provisions for stipulated penalties in the event of noncompliance

with any event, to take care of *all* of the solid waste in the County, including commercial waste and construction and demolition waste as contemplated by Paragraph V of the 1975 Consent Decree.[2]

21) The County shall, within 120 days of the date of the Final Order on this motion, furnish the United States Attorney's Office, the United States Environmental Protection Agency and the New York State Department of Environmental Conservation with copies of a draft long-range plan and all supporting documentation, including but not limited to all plans, proposals, timetables, studies, reports, specifications, contracts, designs, monitoring data, blueprints, engineering drawings and any other data prepared by the County's agents, officer, employees, experts, independent contractors or consultants, relating to the long-term solid waste plans required hereunder (collectively, the "Plans").

22) The United States shall select and retain a consultant, at the County's expense, on terms and conditions acceptable to the United States, for the purpose of evaluating the adequacy of the County's Plans and any and all plans developed to devise and implement long-term solid waste plans of all solid waste in the County, including commercial waste and construction and demolition waste as contemplated by Paragraph V of the 1975 Decree and by this court.

23) Non-compliance with any of the scheduled milestone events will be sanctioned by stipulated penalties. *United States v. City of Yonkers,* 856 F.2d 444, 460 (2d Cir.1988) (within district judge's discretion to impose fines for contempt violation).

24) The parties will have 15 days from the date of the Order, filed simultaneously herewith, to submit any proposed amendments to these Findings and Conclusions.

The County is fined $1,000,000.00 for contempt of court and $10,000.00 per day until compliance with this Order. The fines take effect six months from the date of the court's Final Order, unless the County has

**2.** The fine will be set forth in the Final Order.

purged itself of contempt, as set forth in the court's original Findings of Fact and Conclusions of Law of June 14, 1990 as now amended.

The Government is directed to submit on 10 days notice to the Defendant County a proposed Final Order in accordance with the court's original Findings of Fact and Conclusions of Law as now amended.

So ordered.